E-FILED
Thursday, 24 October, 2019  03:05:57 PM
Clerk, U.S. District Court, ILCD

FILED

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Central District of Illinois

OCT 2 4 2019

CLERK OF THE COURT
CENTRAL DISTRICT COURT
URBANA, ILLINOIS

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) Case No. 19-MJ- 7218 |
| | ) |
| The residence located at 1595 W. Macon Street, Decatur, Illinois 62522 | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is attached hereto and incorporated by reference.

located in the ____Central____ District of ____Illinois____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached hereto and incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 841(a)(1) | Distribution of a Controlled Substances |

The application is based on these facts:

See Fattached affidavit of Drug Enforcement Administration Investigator Scott Garriott, which is incorporated by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days.* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/MATTHEW NOBLET

_____
Applicant's signature

DEA Special Agent Matthew Noblet
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
____electronic mail and telephone____ *(specify reliable electronic means)*.

s/ERIC I. LONG

Date:  10/24/2019

_____
Judge's signature

City and state:  Urbana, Illinois

United States Magistrate Judge Eric I. Long
Printed name and title

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE RESIDENCE LOCATED AT 1595 W. MACON STREET, DECATUR, ILLINOIS 62522 | Case No. 19-MJ-_7218_<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF AN
### APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Scott M. Garriott, the undersigned affiant, being first duly sworn upon oath, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.   I, Scott Garriott, am a Diversion Investigator of the Drug Enforcement Administration (DEA), and have been for over 28 years. I am presently assigned to the Springfield, Illinois, Resident Office. I have received specialized training in various aspects of narcotics investigations, which include, but are not limited to, the diversion of pharmaceutical controlled substances and individuals and organizations deriving income from the unlawful distribution of pharmaceutical controlled substances. I have conducted dozens of cases involving the diversion of pharmaceutical controlled substances and the resulting income. I have interviewed witnesses and drug traffickers in the course of investigations.  I have assisted in the execution of search warrants, and seized assets relating to illegal drug trafficking.  I have helped prepare numerous complaints and search warrant affidavits, and testified in court

regarding my participation in drug investigations.  Prior to working for DEA, I was employed by the Indiana Attorney General's Office for three years conducting investigation involving medical licensure violations and consumer fraud.

2.      I am empowered by law to conduct investigations of for the offenses enumerated in Title 18 of the United States Code, as amended, related to money laundering, and the offenses enumerated in Title 21 of the United States Code, as amended, relating to the possession and distribution of narcotics. As a Drug Enforcement Administration Diversion Investigator, I am authorized to be the affiant for search warrants issued under the authority of the United States.

3.      The statements contained in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## PURPOSE OF AFFIDAVIT

4.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises located at 1595 W. Macon Street, Decatur, Illinois 62522 (hereinafter referred to as the "Subject Premises"), further described in Attachment A, for the items specified in Attachment B,

2

which items constitute instrumentalities, fruits, and evidence of violations of Title 21,

United States Code, Section 841, Unlawful Distribution of Controlled Substances. The

Subject Premises is further described as a brink two-story with third floor dormers. The

house features white trim and shutters as well as portico with white columns. The front

of the house has ivy cover on the exterior and the yard has heavy vegetation. A brick

paver walkway leads to the residence. The residence is located in the southeast corner

of West Macon Street and South Dennis Avenue in Decatur, Illinois. There are stone

columns and short walls on the northwest and southwest corners of this corner lot.

There is a detached brick two car garage in the rear of the house.

     5.     Based on the facts set forth below in this affidavit, there is probable cause

to believe that John W. NEWLIN, M.D. has utilized the Subject Premises to maintain

records relating to controlled substance trafficking in violation of Title 21, United States

Code, Sections 841 and 846. I am requesting authority to search the entire Subject

Premises, including the residential dwelling and any garage, grounds, and vehicles

parked upon the property, as well as any computer, smartphone and computer media

located therein where the items specified in Attachment B may be found, and to seize

all items listed in Attachment B as instrumentalities, fruits, and evidence of crime.

## PROBABLE CAUSE

### Initiation of Investigation

     6.     In April 2014, DEA received a complaint and developed intelligence

regarding a target, John W. NEWLIN, M.D., relating to his excessive prescribing of

3

controlled substances. In November 2014, a Cooperating Source noted in an interview

that Sukwinder S. MULTANI, M.D. had told him/her that Dr. NEWLIN, a medical

doctor in Decatur, Illinois would write (prescriptions) for "anything". Dr. MULTANI

himself was arrested in September 2015 for illegal distribution of controlled substances

and pleaded guilty of the same in November 2016.

7.      In April 2018, DEA received information from a pharmacist in Decatur,

Illinois, that Dr. NEWLIN was continuing to write controlled substance prescriptions

for patients despite having closed his office and no longer having access to the practice.

In May 2018, DEA received additional information from another pharmacist that she

had received a prescription for hydrocodone, despite knowing Dr. NEWLIN's office to

be no longer operating. DEA contacted a DEA Task Force Officer (TFO) in Decatur,

Illinois.  The TFO traveled to Dr. NEWLIN's office, where he observed signs on the

door.  These signs included one indicating that the office would close at the end of May

2018 and another which indicated the office was closed until further notice.  The TFO

noted that while the office did not seem to be in operation, the door was open and he

could hear voices in the back of the office area.  The TFO did not enter the office.

8.      In July 2018, an administrative subpoena was issued to the Illinois

Prescription Monitoring Program for a profile of Dr. NEWLIN's prescriptions for the

controlled substances.  The results of that subpoena revealed a large number of

controlled substance prescriptions issued over a two-year period of time

(approximately 14,353).  Several prescriptions reflected excessive quantities of

controlled substances prescribed, including single prescriptions written for 450 and 540

dosage units of Tramadol (50 mg.). Also noted was a patient receiving 330 dosage units

of methadone (10 mg.), every 30 days (total of 110 mg per day) for 15 months, and

another patient receiving 300 doses of methadone (10 mg.), every 30 days (100 mg. per

day) for the previous two years. Also, noted was a pattern of refilling controlled

substance prescription several days before a same or similar prescription should have

been entirely used.

9.      In August 2018, DEA received incident reports from the Logan County

Sheriff's Department regarding the overdose death of a patient of Dr. NEWLIN's,

C.A.K, on May 26, 2018. The immediate cause of death was provided as combined

hydrocodone, morphine, nortriptyline, alprazolam, alcohol, cocaine, and amphetamine

intoxication. A review of the Illinois Prescription monitoring data of Dr. NEWLIN's

prescriptions for C.A.K. revealed that Dr. NEWLIN had prescribed excessive monthly

prescriptions for hydrocodone, morphine, alprazolam, and zolpidem to the C.A.K,

including hydrocodone with acetaminophen , 10/325 mg quantity of 150, filled on

05/25/2018 and 05/01/2018; morphine sulfate, 30 mg, quantity of 120, on 05/25/2018

and 05/02/2018; alprazolam, 1 mg, quantity of 120, on 05/14/2018; zolpidem tartrate,

10 mg, filled on 05/01/2018.

10.     In October 2018, DEA received an e-mail from Purdue Pharma Sales

Department with concerns about Dr. NEWLIN's excessive prescribing. Follow-up

information provided by Purdue Pharma showed an internal review of prescription

data revealed what the company believed was excessive amounts of Norco

(hydrocodone) and tramadol bring prescribed by Dr. NEWLIN.

11.     Also, in October 2018, an additional Illinois Prescription Monitoring

report for Dr. NEWLIN was subpoenaed to determine what controlled substance

prescriptions were issued subsequent to the closing of his practice anticipated at the end

of May. Numerous large quantity controlled substance prescriptions were still being

written by Dr. NEWLIN in June and July of 2018.

12.     On April 10, 2019, while conducting an interview relating to a different

investigation, DEA investigators met with S.B.[1], who identified himself as a former

patient of Dr. NEWLIN's.  In that interview, S.B. advised the DEA while he had

legitimate medical reasons for his controlled substance prescriptions received from Dr.

NEWLIN, he did not believe all patients had a legitimate reason for those prescriptions.

S.B. provided the names of two persons -- J.H. and L.W. – as other patients of Dr.

NEWLIN's.  S.B. had also indicated that he had regularly illegally purchased controlled

substances from L.W. and her sister (later determined to be P.R.) previously.

### Interviews of NEWLIN Patients J.H., L.W., & P.R.

13.     On May 10, 2019, DEA and the Illinois Department of Financial and

Professional Regulation investigators interviewed three former patients of Dr.

---

[1] S.B. had not previously been utilized as a source by DEA.  S.B. was being interviewed as part of a proffer
agreement for pending criminal charges (drug-related). S.B. has prior felony convictions known to law enforcement
including Domestic Battery and Public Aid Recipient Fraud.

NEWLIN's: P.R., L.W., and J.H.  These individuals were found based on the above-described interview with patient S.B.

14.     Patients P.R.[2] and L.W[3]. claimed to have legitimate medical issues for their controlled substance prescriptions from Dr. NEWLIN but provided differing stories as to Dr. NEWLIN's general practices.

15.     Patient L.W. said she was patient of Dr. NEWLIN's for approximately two or three years.  L.W. said she was prescribed four "Norco" (hydrocodone-containing pharmaceuticals) and eight tramadol per day by Dr. NEWLIN.  L.W. noted she was seen every three to six months but otherwise called the office and was allowed to pick up a written prescription.  L.W. recalled that on her last "appointment," Dr. NEWLIN was writing prescriptions at the front desk of the office, without conducting any physical examinations on the patients. L.W. said she had never been subjected to drug testing or pill counts while she was Dr. NEWLIN's patient. L.W. admitted she was taking "too much" medication for her pain levels.

16.     Patient P.R. was unsure how long she had been a patient of Dr. NEWLIN's.  P.R. claimed she was required to see Dr. NEWLIN every three months and was subjected to drug testing and pill counts during those visits.   P.R. said the usual

---

[2] P.R. had not previously been utilized as a source by DEA.  P.R. has felony prior convictions known to law enforcement including Forgery and Deceptive Practices.

[3] L.W. had not previously been utilized as a source by DEA.  L.W. has prior felony convictions known to law enforcement including Obstruction of Justice, Retail Theft, Armed Robbery, Attempted Burglary, Forgery, and Deceptive Practices.

procedure to receive prescription refills for Dr. NEWLIN was to call the office two days

prior and pick up the prescription in person at the office.  P.R. said the last prescription

was received without an appointment and was provided to her in person by Dr.

NEWLIN personally.

17.     J.H. said she had received hydrocodone prescriptions from Dr. NEWLIN

for approximately four years and had never been subjected to random drug testing or

pill counts during that time.  J.H. reported she had missed at least one three-month

appointment with Dr. NEWLIN, but that he had continued to prescribe her medication.

J.H. reported she stopped seeing Dr. NEWLIN in March 2018.  J.H. also reported she

had not had a check-up by Dr. NEWLIN during her last six months of being a patient.

Rather than appear in person for an appointment during that time, she would call Dr.

NEWLIN's office and pick up a written prescription (signed by Dr. NEWLIN) at the

front desk of his practice's office.

18.     J.H. admitted to becoming addicted to hydrocodone-containing products

(schedule 2 narcotic controlled substances) issued by Dr. NEWLIN.  J.H. reported she

was currently participating in a Suboxone (buprenorphine) treatment program and had

not used opiates (other than the buprenorphine) for several months prior to our

interview in May 2019.

19.     J.H. also stated that she had been pregnant while receiving the

hydrocodone prescriptions. According to J.H., the baby girl was born with issues

related to the use of the hydrocodone (minor withdrawal symptoms) and had tested

positive for opiates at birth. The baby was hospitalized for approximately four days as a result of the complications from opiate withdrawals. J.H. stated she was investigated by the Illinois Department of Children and Family Services as a result of the baby testing positive for opiates.

20.     On June 11, 2019, J.H. was interviewed a second time by investigators who obtained a medical records release from her. During this interview J.H. she said she was aware that other patients had received care from Dr. NEWLIN while the patients were pregnant. J.H. could not recall the names of those patients.

**Interview of NEWLIN Patient M.M.**

21.     On May 10, 2019, DEA and the Illinois Department of Financial and Professional Regulation investigators interviewed Dr. NEWLIN Patient M.M.

22.     M.M indicated she had been seen by Dr. NEWLIN for approximately five months and was prescribed opiates for a bulging disc and knee issues. M.M. claimed she saw Dr. NEWLIN once per month during this period. M.M. claimed that she was subjected to random drug testing initially but that the testing stopped before the end of her time as a patient of Dr. NEWLIN's. M.M. said that the usual process to obtain a prescription refill from Dr. NEWLIN was to call two days before the medication was needed and then pick up the prescription in person at Dr. NEWLIN's office. M.M. said the last written prescription she received was directly from Dr. NEWLIN. On that date, M.M. said she had called and requested her prescription. When she arrived at the office to pick the prescription up, she said Dr. NEWLIN was the only employee present in the

office, was sitting at the front reception desk of the office with a prescription pad, and

provided M.M the requested prescription.  M.M. did not attempt to obtain her medical

records.

**Interview of NEWLIN Patient C.K. #1**

23.      On May 10, 2019, DEA and the Illinois Department of Financial and

Professional Regulation investigators interviewed Dr. NEWLIN Patient C.K. #1[4].

24.      Patient C.K. #1 said she was patient of Dr. NEWLIN's for approximately

one year. C.K. #1 said she saw Dr. NEWLIN once or twice during that time.  C.K. #1

said all refills were done via telephone and did not require an additional office visit.

C.K. #1 said she was prescribed hydrocodone-containing products and tramadol for

endometriosis.  C.K. #1 said no tests were conducted to confirm the diagnosis and no

(medical) records were provided to Dr. NEWLIN prior to her receiving the prescription.

C.K. #1 said she never was required participate in a random drug test and she never

had a pill count while seeing Dr. NEWLIN. C.K. #1 said, and the Illinois Prescription

Monitoring data confirmed, that she had received as many as 120 tablets of

hydrocodone-containing products (a schedule II narcotic controlled substance) and 240

tablets of tramadol (a schedule IV narcotic controlled substance) on one prescription,

which she used simultaneously.  C.K. #1 indicated that she had completed a treatment

program for opiate addiction with the Crossing (Decatur, Illinois) and Gateway

---

[4] C.K. #1 had not previously been utilized as a source by DEA. C.K. #1 has a felony prior conviction known to law enforcement, Obstruction of Justice.

(Springfield, Illinois) programs after ceasing to see Dr. NEWLIN. She further stated

that she had been "clean" from narcotics for several months prior to the interview.

C.K. #1 provided the names of other patients she believed to be similarly situated in

that they became addicted to opiates after being a patient of Dr. NEWLIN's. C.K. #1

understood Dr. NEWLIN to be the "go-to guy" in the Decatur area if one wanted drugs

and that she had been told one could get a prescription from Dr. NEWLIN for $50.

25. C.K #1 denied having any kind of a relationship outside of the office with

Dr. NEWLIN.

26. C.K. #1 claimed that people who were not patients of Dr. NEWLIN would

also regularly appear at his office pretending to be his patients. C.K. #1 further stated

she believe these persons obtained from Dr. NEWLIN their requested prescriptions and

that Dr. NEWLIN never confirmed if those persons were in fact patients of his practice.

27. On June 11, 2019, C.K. #1 was interviewed again during which a medical

records release for her records was obtained. C.K. #1 confirmed she did not receive any

prescriptions from Dr. NEWLIN while pregnant but supplied names of patients who

she believed had. C.K. #1 also supplied the name of a person she believed to be selling

his Dr. NEWLIN-prescribed medication to buy illegal street drugs.

### Interview of NEWLIN Patient C.K. #2

28. On May 10, 2019, DEA and the Illinois Department of Financial and

Professional Regulation investigators interviewed Dr. NEWLIN Patient C.K. #2.

11

29.     Patient C.K. #2 said she was patient of Dr. NEWLIN and had been provided a large amount of controlled substances by Dr. NEWLIN, including tramadol (a schedule IV narcotic controlled substance).  C.K. #2 said she was subjected to neither random drug tests nor pill counts by Dr. NEWLIN while a patient.  C.K. #2 said she was going to Dr. NEWLIN for a broken tail bone in 2018 but that no tests, x-rays, or other proof that her tail bone was actually broken was obtained.  A review of Illinois Prescription Monitoring data confirmed C.K. #2 was receiving prescriptions for tramadol and hydrocodone with acetaminophen from Dr. NEWLIN.

30.     C.K. #2 denied any relationship outside the office with Dr. NEWLIN.

31.     On June 11, 2019, C.K. #2 was interviewed again. C.K. #2 was asked to sign a medical records release for the investigators.  C.K. #2 said she was not sure if she was even considered a patient of Dr. NEWLIN, though he had provided her with tramadol prescriptions.  C.K. #2 reported Dr. NEWLIN never examined her, she had never given him any money, and she had never provided him with any (medical) records. C.K. #2 did sign a medical records release for investigators. C.K. #2 also noted she had received a prescription for Vicodin (hydrocodone) from Dr. NEWLIN, which she believed she did not get filled because she believed it was for too much medication.

### Interview of NEWLIN Patient J.C. and her son, R.C.

32.     On May 14, 2019, DEA and the Illinois Department of Financial and Professional Regulation investigators interviewed Dr. NEWLIN Patient J.C.

33.      Patient J.C. said she was patient of Dr. NEWLIN for a short time. J.C.

stated she went to Dr. NEWLIN because her normal physician (Dr. Richard Fritz) had

died and Dr. NEWLIN was in the same practice.  J.C. stated she only saw Dr. NEWLIN

two or three times.  J.C. stated the second appointment with Dr. NEWLIN was for a

physical required for clearance for surgery.  J.C. stated Dr. NEWLIN only listened to her

heart and did little to no other testing or examination during this appointment.  J.C.

stated Dr. NEWLIN was wearing clothes that were very dirty and that NEWLIN had

very strong offensive body odor.  J.C. stated the pain medications she was prescribed by

Dr. NEWLIN were given for issues with her knee (she had multiple surgeries on her

knee).  J.C. stated Dr. NEWLIN never required medical records proving the knee

conditions were present or that surgery had been performed.  J.C. stated she never had

to undergo random drug testing or random pill counts while she was a patient of Dr.

NEWLIN.  J.C. stated that she was currently receiving in-home physical therapy for her

ongoing knee issues.

34.      Illinois Prescription Monitoring Program data confirmed J.C. had been

provided Belsomra (a schedule IV controlled substance sleep aid) and six hydrocodone

prescriptions from Dr. NEWLIN.  J.C. claimed she did not remember receiving the

Belsomra prescriptions or as many as six hydrocodone prescriptions.  J.C. did recall that

her son, R.C., had picked up at least one of the prescriptions for her.

35.      On May 23, 2109, the investigators interviewed R.C. regarding NEWLIN

Patient J.C.  R.C. stated he only had one interaction with Dr. NEWLIN while his mother

was a patient. R.C. stated he had met with Dr. NEWLIN to obtain J.C.'s prescription

(her last from Dr. NEWLIN). R.C. stated he went to Dr. NEWLIN's office to request the

final prescription on or about April 24, 2018. R.C. stated there were approximately ten

or fifteen people present in the office and the only employee present was Dr. NEWLIN.

R.C. stated Dr. NEWLIN was sitting behind the front reception counter and patients

would approach the counter, request the prescriptions they needed, and Dr. NEWLIN

would write the prescriptions at that time. R.C. stated he approached the front counter

when it was his turn and simply provided Dr. NEWLIN with J.C.'s name, then

requested a refill of her medication. R.C. stated Dr. NEWLIN could not recall what

medication J.C. had been prescribed, so he asked R.C. how the prescription should be

written. R.C. stated J.C. was prescribed ninety Hydrocodone with acetaminophen

(5mg./325mg.), but R.C. noted to Dr. NEWLIN that J.C. was using her full prescription

up before the end of each month. R.C. stated Dr. NEWLIN then asked if one hundred

and twenty pills would be sufficient for J.C. R.C. stated he agreed with Dr. NEWLIN

that one hundred and twenty pills would be sufficient (the Illinois Prescription

Monitoring Program data showed J.C. received 135 pills on the date in question). R.C.

stated Dr. NEWLIN provided R.C. with the prescription, which he then took to a local

Walgreens Pharmacy to be filled. R.C., when asked by investigators, confirmed

multiple times he had no prior interaction with Dr. NEWLIN and Dr. NEWLIN had no

way to know who R.C. was or if he was a relative of J.C. R.C. stated he was not asked

14

for identification or to provide other confirmation to verify the validity of the

prescription request of Dr. NEWLIN.

### Interview of NEWLIN Patient K.M./ K.N.

36.     On May 14, 2019, DEA and the Illinois Department of Financial and

Professional Regulation investigators interviewed Dr. NEWLIN Patient K.N., also

known as, K.M.[5]

37.     K.N. stated she started as a patient of Dr. NEWLIN's at approximately

fourteen years of age.  K.N. was in an accident at this time and began receiving

prescriptions for opiates from Dr. NEWLIN.   K.N. stated that over a period of

approximately twelve years of being a patient, Dr. NEWLIN continued to prescribe

opiates in increasing dosages and numbers to K.N.

38.     K.N. stated that during her time as a patient of Dr. NEWLIN's, he often

appeared in dirty clothing, had terrible body odor, and appeared to be "high."  K.N.

was asked to clarify what she meant by "high," and she explained Dr. NEWLIN was

"out of it," nodding off, and talking with his eyes closed.

39.     K.N. stated Dr. NEWLIN never required random drug tests or random

pill counts while he was prescribing opiates to her.  K.N. stated Dr. NEWLIN did not

perform any thorough medical examinations or testing to determine what injuries were

present and what the best course of treatment may be.  K.N. stated she was not forced

---

[5] K.N./K.M. had not previously been utilized as a source by DEA. K.N./ K.M has prior felony convictions known to law enforcement including Battery, Robbery, and Possession of Dangerous Drugs.

to come into the office for appointments before obtaining refills and only had to make

an appointment when she wanted to.  K.N. stated Dr. NEWLIN never offered

conservative treatment (physical therapy, NSAID prescriptions, etc.), but instead went

directly to opiates.

40.     K.N. stated she informed Dr. NEWLIN that she was obtaining opiates

(hydrocodone and oxycodone) illegally from other individuals, and Dr. NEWLIN

simply advised her to not obtain medication in that manner before increasing the

number of pills she received from ninety to one hundred and twenty (hydrocodone) per

script.

41.     K.N. explained that the years of opiate prescriptions and increased

dosages eventually resulted in her becoming addicted and physical dependent on

opiates.  K.N. stated she went through a drug court program in approximately

December of 2017 and did not see Dr. NEWLIN after that time. K.N. stated she went

through a treatment program and is currently on methadone (maintenance treatment).

K.N. noted to investigators that Dr. NEWLIN, "seriously ruined [her] life" and that she

was 26 years old when she graduated from the drug court program successfully.

42.     K.N. stated that she went to Dr. NEWLIN's office during the time it was

closing in an attempt to obtain her medical records.  K.N. stated she completed the

forms to request her records but has not received them.

16

43.     K.N. stated Dr. NEWLIN was the only person present in the office and that she believed he was there providing prescriptions for patients before the practice closed permanently.

44.     K.N. denied having any sort of a relationship with Dr. NEWLIN outside of the office.  K.N. noted Dr. NEWLIN never "came on" to her.  K.N. said Dr. NEWLIN was very incoherent in her last visit to him, talking about his wife's health and mentioned his wife had found out about him (Dr. NEWLIN) sleeping with a male prostitute.

45.     K.N. provided investigators with names of additional persons who may have information regarding Dr. NEWLIN.

46.     On June 11, 2019, K.N. was again interviewed by investigators who obtained a medical records release from K.N.  During this meeting, K.N. said K.N. was her maiden name and K.M. was her married name.  K.N. also believed that Dr. NEWLIN had failed to diagnosis her thyroid cancer.

### IDCFS contact and investigation

47.     On May 23, 2019, DEA and the Illinois Department of Financial and Professional Regulation (IDFPR) investigators met with the Illinois Department of Children and Family Services (IDCFS) in Decatur, Illinois.

48.     The investigators spoke to Angelique Maxwell at IDCFS' Decatur office in an attempt to obtain additional information in reference to the IDCFS case involving J.H.  J.H. was a patient of Dr. NEWLIN's who had stated in a previous interview that

17

Dr. NEWLIN had prescribed her opiates during her entire pregnancy. J.H. further stated in the same interview that her child had been born with medical issues related to her opiate use that had required several days in the Neonatal Intensive Care Unit (NICU) at St. John's Hospital in Springfield.

49.     IDCFS Public Service Administrator (PSA) Maxwell confirmed there was a case involving J.H., but was restricted from providing much additional information. PSA Maxwell provided the IDCFS case number and the assigned investigator for the investigation into J.H. PSA Maxwell directed the DEA and IDFPR investigators to contact IDCFS Legal to request copies of documentation from IDCFS' investigation.

50.     PSA Maxwell, when questioned, stated there are maybe three or four additional cases involving patients of Dr. NEWLIN's that are very similar to the J.H. case.

51.     PSA Maxwell also stated that when the IDCFS investigator spoke with Dr. NEWLIN via telephone and requested the medical records associated with the J.M. case, the investigator was informed that the medical records were not available. Specifically, Dr. NEWLIN allegedly told the investigator that the medical records were "boxed up" and not available for review.

52.     On June 6, 2019, IDFPR issued a subpoena to IDCFS for information/ documentation regarding the investigation involving J.H.

53.     On July 3, 2019, IDFPR received a response from IDCFS. According to IDFPR, the information provided stated J.H. gave birth to a female child on March 5,

2018. The child was born with opiates in her system, which required additional and

specialized care. The baby being born with opiates in her system resulted in the IDCFS

investigation being opened into J.H.

54.     According to the IDCFS reports, Dr. NEWLIN had prescribed J.H. 120

pills of hydrocodone with acetaminophen (7.5 mg/325 mg) per a 30-day period on the

following dates: 03/14/2017, 04/11/2017, 05/15/2017, 06/14/2017, 07/14/2017,

08/09/2017, 09/08/2017, 10/08/2017, 11/07/2017, 12/08/2017, 01/04/2018, and

02/02/2018. J.M. gave birth on 03/05/2018.

55.     On March 08, 2018, the IDCFS investigator called Dr. NEWLIN and had

left a message requesting a return phone call.

56.     According to a report provided by IDCFS, on March 09, 2108, the IDCFS

investigator made contact with Dr. NEWLIN and discussed the case. Dr. NEWLIN

stated he did not know J.H. was pregnant during most of the pregnancy. He then

stated that when he had discovered she was pregnant, he had stopped prescribing

controlled substances and had notified her obstetrician. The IDCFS investigator

requested the medical records from Dr. NEWLIN to confirm these statements; Dr.

NEWLIN stated he would have his nurse send the records to IDCFS via fax. Dr.

NEWLIN also stated patients are seen every three months. According to the

documentation provided to DEA/IDFPR by IDCFS, Dr. NEWLIN also stated that his

patients were required to take an additional step prior to being prescribed medication

in order to ensure compliance with the medical treatment, though details of that step

had been redacted from the copy provided to DEA/IDFPR. Based on my training and

experience, I believe this additional step was drug testing. To note, J.H. had indicated

to DEA investigators that no drug testing had been required of her during her final six

months of treatment or ever for that matter.

57.     On April 11, 2018, the IDCFS investigator had contacted Dr. NEWLIN and

asked for the status of him providing the medical records for J.H.'s care. Dr. NEWLIN

stated he was occupied with a critically ill wife and was in the process of closing his

office. Dr. NEWLIN again stated J.H. never informed him she was pregnant and that

patients are usually seen every three months to continue receiving prescriptions. Dr.

NEWLIN stated he would forward the requested medical records in a few days.

58.     IDFPR did not receive from IDCFS any medical records for J.H., and there

was no indication in the IDCFS report that would indicate those records were ever

received.

### Walmart Pharmacies Information

59.     On May 9, 2019, DEA and IDFPR investigators interviewed pharmacist

Lynette Chausse at Walmart Pharmacy, Decatur, Illinois.

60.     Mrs. Chausse stated she was very familiar with Dr. NEWLIN and had had

disagreements with him on multiple occasions relating to treatment of his patients.

Mrs. Chausse stated the issues were related to the controlled substance prescriptions

Dr. NEWLIN was writing during the time his office was closing and after it had closed.

Mrs. Chausse stated she had refused to fill prescriptions written by Dr. NEWLIN on

multiple occasions, because she did not believe Dr. NEWLIN had a valid relationship

with the patient being prescribed the controlled substance medication. She further

stated she had believed the signatures on the prescriptions may have been forged. Mrs.

Chausse stated she (and possibly other Walmart pharmacists) had received approval

from Walmart corporate headquarters to stop filling prescriptions written by Dr.

NEWLIN. Mrs. Chausse stated she would provide DEA/IDFPR investigators with

copies of the prescriptions she believed had been forged and would confirm whether

she could provide investigators with the letter from Walmart's corporate headquarters

stating she no longer had to fill prescriptions for Dr. NEWLIN.

61.     On July 12, 2019, an IDFPR investigator received a telephone call from

Stanley Jones from Walmart Global Investigations in reference to the documentation

request. Mr. Jones stated Walmart has three levels of denials for prescriptions in their

pharmacies. A denial Level (1) may authorize a pharmacist to reject one prescription

from a medical treatment provider; a Level (2) may authorize a pharmacist to refuse all

prescriptions from a single medical treatment provider; or a Level (3) may authorize

denials/rejections of all prescriptions from a single medical treatment provider at all

Walmart locations. Mr. Jones stated he believed Dr. NEWLIN's denial had been a level

(2), which authorized Mrs. Chausse to refuse to fill any/all prescriptions from Dr.

NEWLIN.

62.     On July 15, 2019 the IDFPR received an email and Excel document from

the Walmart legal department. The Excel document provides the explanation given by

pharmacists who refused to fill Dr. NEWLIN's prescriptions. These denials occurred at two Walmart Pharmacy locations. The section of the Excel sheet that reported the reasoning was entitled, "Red Flags." Two denials were described:

    a. May 3, 2019: "Prescriber provides the same diagnosis for a majority of individuals, prescriber routinely writes for large loses of controlled substances, prescriber writes same medication dosage directions for large number of individuals."

    b. May 6, 2019: "Prescriber provides the same diagnosis for a majority of individuals, prescriber routinely writes for a cocktail of commonly abused drugs or combo that can cause medical complications, prescriber routinely write for large doses of controlled substances, prescriber writes a large number or percentage of controlled substances, prescriber writes same medication dosage directions for large number of individuals."

63.    These two denials appear to have been handled by two separate Walmart pharmacies, #2728 & #1690.

**Contact with CEO of The Crossing**

64.    On June 13, 2019, DEA and IDFPR investigators met with representatives from the Macon County Sheriff's Office and Tanya Andricks, CEO, Crossing Healthcare. Ms. Andricks acknowledged that there were multiple former patients of Dr. NEWLIN who were currently being seen at Crossings for substance abuse issues. Ms.

22

Andricks believed the medical records of Dr. NEWLIN were at Decatur Memorial Hospital.

65.      On June 14, 2019, Ms. Andricks contacted DI Garriott and was able to confirm Dr. NEWLIN's records were not in the possession of Decatur Memorial Hospital as Dr. NEWLIN had cleaned out his own offices.

### Recorded conversation with John NEWLIN, M.D.

66.      On September 13, 2019, Drug Enforcement Administration (DEA) Diversion Investigator Scott Garriott responded to telephone messages left in the days prior by John W. NEWLIN, M.D.  Dr. NEWLIN had contacted the DEA regarding his DEA Registration, BN0223278.  Dr. NEWLIN was requesting help to renew his DEA registration, which was set to expire on October 31, 2019, and Dr. NEWLIN was seeking to move his registration back to Illinois from Missouri. DI Garriott recorded the telephone call between himself and Dr. NEWLIN.

67.      DI Garriott first verbally confirmed with the caller that he was Dr. NEWLIN.  Dr. NEWLIN stated he needed assistance in renewing and updating his DEA registration, further stating that he had begun working in Missouri on 12/10/2018 and had worked in that state for a few months.

68.      Dr. NEWLIN stated he had decided to no longer work in Missouri and had moved back to Illinois.  He stated he is currently living in his house in Decatur, Illinois. Dr. NEWLIN stated he wanted to work in Illinois so he could be closer to his family.

69.    Dr. NEWLIN confirmed his Decatur, Illinois, medical practice was closed. Dr. NEWLIN stated that before closing his Decatur medical practice, he had copied approximately 700 patient records and forwarded the records to other physicians so patients could continue their care.

70.    In the same phone call, Dr. NEWLIN indicated he was clearing out his house (believed to be the residence at 1595 W. Macon St., Decatur, Illinois). He further stated he had his DEA certificate in his belongings, which were in several different places. It was confirmed with Dr. NEWLIN that when he vacated his office he took everything to his residence in Decatur, Illinois.

71.    Dr. NEWLIN stated he had electronic patient medical records from his former Decatur (Illinois) practice in his apartment in Missouri contained on a hard drive. Dr. NEWLIN had not moved these electronic records back to Illinois as of the date of the call. Dr. NEWLIN explained that hospital records for his patients were maintained on the Decatur Memorial Hospital computers using the EPIC software system and that his office patient records were maintained on the hard drive using ALLSCRIPTS software. Dr. NEWLIN claimed he had started maintaining his patient medical records in electronic format 10 years prior (approximately 2009). When asked, Dr. NEWLIN said his re-location back to Decatur would likely occur in one to several months.

72.    A CLEAR records search by DEA investigators showed Dr. NEWLIN's Illinois address to be 1595 W. Macon Street, Decatur, Illinois. This information was

24

confirmed on October 21, 2019, when Macon County, Illinois, property tax records were reviewed, and Dr. NEWLIN was shown as the current owner of this property.

73.     While on the phone call on September 13, 2019, DI Garriott assisted Dr. NEWLIN in logging onto the DEA Registration system to complete the address change request and renew his registration.

### Technical Terms

74.     As described above and in Attachment B, this application seeks permission to search for records that might be found at the SUBJECT PREMISES, located at 1595 W. Macon, Decatur, Illinois. One form in which the records may be found is data stored on a computer's hard-drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stores information, all under Rule 41(e)(2)(B).

75.     *Probable cause.* I submit that if computers or other storage media are found within 1595 W. Macon, Decatur, Illinois, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

>    a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little to no cost. Even when

files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

26

    d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

76.    As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

    e. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record

information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

f.   As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as

28

described herein, computers typically contain information that log:
computer user account session times and durations, computer activity
associated with user accounts, electronic storage media that connected
with the computer, and the IP addresses through which the computer
accessed networks and the internet.  Such information allows
investigators to understand the chronological context of computer or
electronic storage media access, use, and events relating to the crime
under investigation.  Additionally, some information stored within a
computer or electronic storage media may provide crucial evidence
relating to the physical location of other evidence and the suspect.
For example, images stored on a computer may both show a
particular location and have geolocation information incorporated
into its file data.  Such file data typically also contains information
indicating when the file or image was created.  The existence of such
image files, along with external device connection logs, may also
indicate the presence of additional electronic storage media (e.g., a
digital camera or cellular phone with an incorporated camera).  The
geographic and timeline information described herein may either
inculpate or exculpate the computer user.  Last, information stored
within a computer may provide relevant insight into the computer
user's state of mind as it relates to the offense under investigation.

29

For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

i.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

77.   *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

j.   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be

unreasonable. As explained above, because the warrant calls for

forensic electronic evidence, it is exceedingly likely that it will be

necessary to thoroughly examine storage media to obtain evidence.

Storage media can store a large volume of information. Reviewing

that information for things described in the warrant can take weeks or

months, depending on the volume of data stored, and would be

impractical and invasive to attempt on-site.

k. Technical requirements. Computers can be configured in several

different ways, featuring a variety of different operating systems,

application software, and configurations. Therefore, searching them

sometimes requires tools or knowledge that might not be present on

the search site. The vast array of computer hardware and software

available makes it difficult to know before a search what tools or

knowledge will be required to analyze the system and its data on the

Premises. However, taking the storage media off-site and reviewing

it in a controlled environment will allow its examination with the

proper tools and knowledge.

l. Variety of forms of electronic media. Records sought under this

warrant could be stored in a variety of storage media formats that

may require off-site reviewing with specialized forensic tools.

32

78.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

79.    Based on the above facts, I believe, that John W. NEWLIN, M.D., has caused controlled substances to be distributed for a purpose other than legitimate medical purposes. Dr. NEWLIN has issued controlled substances in amounts excessive to medical need, which resulted in opiate addiction issues in several former patients. Dr. NEWLIN has issued controlled substance prescriptions to at least one pregnant patient, resulting in child being born with opiates in her system and with medical issues requiring a multiple day admission to the Neonatal Intensive Care Unit. Dr. NEWLIN has prescribed controlled substances without the support of diagnostic testing or receiving proper documentation of pre-existing conditions that would necessitate those medications. Dr. NEWLIN's decision to prescribe excessive controlled substances attributed, at least in part, to the overdose death of one former patient. Dr. NEWLIN

has prescribed controlled substances when he was aware, or should have been aware, the patient had a drug addiction problem.

80.     Dr. NEWLIN is the sole person responsible for the medical records created at his medical practice, and there is probable cause that Dr. NEWLIN has maintained those records in hard copy form and/or on computers or electronic devices in his home residence 1595 W. Macon Street, Decatur, Illinois.  Further, I believe based on the above facts that Dr. NEWLIN is still in possession of medical records within that residence and within the contents of any computers or electronic devices located at 1595 W. Macon Street, Decatur, Illinois.  I further submit that there will be evidence, fruits, and instrumentalities of crimes, namely violations of Title 21 United States Code, Section 841, Unlawful Distribution of Controlled Substances, and Title 21, United States Code, Section 846, Attempt or Conspiracy to Unlawfully Distribute Controlled Substances, located within the residence described in Attachment A.

81.     Therefore, I respectfully assert there is probable cause for a warrant to search the Subject Premises described in Attachment A and seize the items described in Attachment B.

FURTHER AFFIANT SAYETH NOT.     s/SCOTT M. GARRIOTT

Scott M. Garriott
DEA Diversion Investigator

Subscribed and sworn to before me this
2 4 th day of October, 2019
s/ERIC I. LONG

United States Magistrate Judge

35

## ATTACHMENT A

### *Property to Be Searched*

1.          The property to be searched is 1595 W. Macon St., Decatur, Illinois (the "Subject Premises"). The Subject Premises is further described as a as a brick two-story with a third floor dormers area. The house features white trim and shutters as well as portico with white columns. The front of the house has ivy cover on the exterior and the yard has heavy vegetation. A brick paver walkway leads to the residence. The residence is located in the southeast corner of West Macon Street and South Dennis Avenue in Decatur, Illinois. There are stone columns and short walls on the northwest and southwest corners of this corner lot. There is a detached brick two car garage in the rear of the house.

Photographs of the front, corner, side, and top of the Subject Premises is included below:







## ATTACHMENT B

### *Description of Items to Be Seized*

The following records, documents, files, items, or materials, in whatever form, including handmade or mechanical form (such as printed, written, handwritten, or typed); photocopies or other photographic form; and electrical, electronic, and magnetic form (such as tapes, cassettes, hard disks, floppy disks, diskettes, compact discs, CD-ROMs, DVDs, optical discs, Zip cartridges, printer buffers, smart cards, or electronic notebooks, or any other electronic storage medium) that constitute or contain evidence, instrumentalities, or fruits of violations of Title 21, United States Code, Sections 841 and 846, Distribution of a Controlled Substance, Conspiracy to Distribute a Controlled Substance, and Attempt to Distribute a Controlled Substance:

1.  All records relating to the violations described above, those violations involving Dr. John NEWLIN and occurring after 2014, including:

    a.  Any and all documents, records, or information describing the treatment of patients with controlled substances, including but not limited to oxycodone, hydrocodone, tramadol, and methadone;

    b.  Any documents or records containing lists of patients treated by Dr. NEWLIN;

    c.  any and all documents, records or information[1] relating to the purchase, sale, importation, possession, shipment, tracking, delivery or distribution of controlled substances;

    d.  any and all records or other items which are evidence of ownership or use of computer equipment found in the Subject Premises, including, but not limited to, sales receipts, bills for internet access, handwritten notes and handwritten notes in computer manuals.

    e.  any and all records relating to an indicia of occupancy, residency, and ownership or use of the Subject Premises, including, but not limited to, utility and telephone bills, cancelled envelopes, rental, purchase or lease agreements, identification documents, and keys;

--------

[1] As used above and on, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks, external hard drives, or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

f.   any and all records of any address and/or telephone books, rolodex
     indicia, electronic organizers, telephone paging devices and the memory
     thereof, and any papers, records or electronic data reflecting names,
     addresses, telephone numbers, pager numbers of co-conspirators, sources
     of controlled substances and/or virtual currency, identifying information
     for customers purchasing controlled substances and/or virtual currency;

g.   all bank records, checks, credit card bills, account information, safe
     deposit box information and other financial records;

h.   all copies of income tax returns filed with the Internal Revenue Service
     (IRS) or the Illinois Department of Revenue.

2.   Any digital devices[2] or other electronic storage media[3] and/or their components
     used as a means to commit the violations described above, including:

a.   any digital device or other electronic storage media capable of being used
     to commit, further, or store evidence or fruits of the offenses listed above;

b.   any digital devices or other electronic storage media used to facilitate the
     transmission, creation, display, encoding or storage of data, including
     word processing equipment, modems, docking stations, monitors,
     cameras, printers, plotters, encryption devices, and optical scanners;

c.   any magnetic, electronic or optical storage device capable of storing data,
     such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs,
     optical disks, printer or memory buffers, smart cards, PC cards, memory
     calculators, electronic dialers, electronic notebooks, and personal digital
     assistants;

---

   [2] "Digital device" includes any device capable of processing and/or storing data in
electronic form, including, but not limited to: central processing units, laptop, desktop,
notebook or tablet computers, computer servers, peripheral input/output devices such as
keyboards, printers, scanners, plotters, monitors, and drives intended for removable media,
related communications devices such as modems, routers and switches, and electronic/digital
security devices, wireless communication devices such as mobile or cellular telephones and
telephone paging devices, personal data assistants ("PDAs"), iPods/iPads, Blackberries, digital
cameras, digital gaming devices, global positioning satellite devices (GPS), or portable media
players.

   [3] Electronic Storage media is any physical object upon which electronically stored
information can be recorded. Examples include hard disks, RAM, floppy disks, flash memory,
CD-ROMs, DVD-ROMs, and other magnetic or optical media.

    d.  any documentation, operating logs and reference manuals regarding the operation of the digital device or other electronic storage media or software;

    e.  any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

    f.  any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

    g.  any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

3.  For any digital device or other electronic storage media upon which electronically stored information that is called for by this warrant may be contained, or that may contain things otherwise called for by this warrant:

    a.  evidence of who used, owned, or controlled the digital device or other electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.  evidence of software that would allow others to control the digital device or other electronic storage media, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.  evidence of the lack of such malicious software;

    d.  evidence of the attachment to the digital device of other storage devices or similar containers for electronic evidence;

    e.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the digital device or other electronic storage media;

    f.  evidence of the times the digital device or other electronic storage media

was used;

    g.  passwords, encryption keys, and other access devices that may be necessary to access the digital device or other electronic storage media;

    h.  documentation and manuals that may be necessary to access the digital device or other electronic storage media or to conduct a forensic examination of the digital device or other electronic storage media;

    i.  contextual information necessary to understand the evidence described in this attachment.

4. Safes and other locked containers;

5. Keys to storage units, lockers and safe deposit boxes; and

6. Controlled substances not legitimately possessed.